IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| ERIN UNDERWOOD<br>113 Tamarac Drive<br>Lexington, Ohio   44904, | ) ) ) | CASE NO. |
| | ) | JUDGE |
| Plaintiff, | ) ) | |
| | ) | **COMPLAINT** |
| vs. | ) ) | **(Jury Demand Endorsed Hereon)** |
| FIVE HANDICAP, INC., d/b/a Mansfield<br>  Graphics and/or Mansfield Graphic<br>127 Walnut Street<br>Mansfield, Ohio 44902, | ) ) ) ) ) | |
| and | ) ) | |
| CHARLES BERNARD MCCARTNEY<br>127 Walnut Street<br>Mansfield, Ohio 44902, | ) ) ) ) | |
| and | ) ) | |
| CAROL MCCARTNEY<br>127 Walnut Street<br>Mansfield, Ohio 44902, | ) ) ) ) | |
| and | ) ) | |
| JASON MCCARTNEY<br>127 Walnut Street<br>Mansfield, Ohio 44902, | ) ) ) ) | |
| Defendants. | ) | |

Plaintiff Erin Underwood, through her undersigned counsel, for her Complaint against

Defendants, states and alleges as follows:

## INTRODUCTORY STATEMENTS

1.  This case involves claims by Plaintiff against Defendants as her employers for discrimination and the creation of a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000-e *et seq.*(hereinafter "Title VII") and under Section 4112.02(A) of the Ohio Revised Code (hereinafter "R.C. 4112.02(A)").

2.  This case further involves claims by Plaintiff against Defendants as individuals under Section 4112.02(J) of the Ohio Revised Code (hereinafter "R.C. 4112.02(J)") for their conduct to aid, abet, incite, compel or coerce discriminatory acts or by their attempt to commit acts of discrimination as alleged herein.

3.  This case further involves claims by Plaintiff against Defendants as her employers for retaliation in violation of Title VII and under Section 4112.02(I) of the Ohio Revised Code (hereinafter "R.C. 4112.02(I)"), and Defendants as individuals for their retaliation under R.C. 4112.02(I) and under R.C. 4112.02(J) for their conduct to aid, abet, incite, compel or coerce retaliatory acts or by their attempt to commit acts of retaliation as alleged herein.

4.  This action further arises pursuant to civil action for false claims under 31 U.S.C. §3730(h) (hereinafter "FCA") against Defendants as Plaintiff's employer for her lawful actions to stop false claims to the Federal government.  Once exhausted, Plaintiff anticipates that she will have additional claims against her employer related to disclosure of information covered by 10 U.S.C. §4701 (hereinafter "Section 4701") which provides protections for employees of contractors or subtractions to the Department of Defense (hereinafter "DOD") and/or National Aeronautics and Space Administration (hereinafter "NASA") from reprisal for the disclosure of information covered under Section 4701.

2

5.   This action further arises pursuant to Section 4113.52 of the Ohio Revised Code (hereinafter "R.C. 4113.52") against Defendants as Plaintiff's employers for taking disciplinary and/or retaliatory action against her for reporting violations of law by her employer or fellow employee(s).

6.   This action further arises pursuant to the Equal Pay Act of 1963, as an amendment to the Fair Labor Standards Act, 29 U.S.C. §206(d) (hereinafter "EPA") and Section 4111.17, of the Ohio Revised Code (hereinafter R.C. "4111.17"), which prohibit gender discrimination on the basis of pay against Defendants as Plaintiff's employers and individuals who have liability for the unequal pay to her in violation of the EPA and R.C. 4111.17.

7.   This action further arises pursuant to Section R.C. 2307.60 of the Ohio Revised Code (hereinafter "R.C. 2307.60") against Defendants as individuals, which provides for civil liability against individuals for criminal acts that occurred by their conduct that violated Section 2921.05 of the Ohio Revised Code (hereinafter "R.C. 2921.05") to retaliate or attempt to retaliate against Plaintiff as a victim of a crime she filed and/or prosecuted resulting from her employment or termination of her employment.

8.   Plaintiff further alleges a public policy violation against Defendants as her employer for retaliation for her complaints internally to her employer and to the Occupational Safety and Health Administration (hereinafter "OSHA") of legitimate health and safety concerns.

### JURISDICTION & EXHAUSTION

9.   This Court's jurisdiction arises under 28 U.S.C. § 1331, 29 U.S.C. §216(b), and 31 U.S.C. §§ 3730(h)(2) & 3732.  Plaintiff further invokes the supplemental jurisdiction of this Court to consider claims arising under state law pursuant to 28 U.S.C. §1367.

10.   Venue is appropriate in this Court under 28 U.S.C. §1391(b) because the claims

alleged arise in Richland County, Ohio, located in the Northern District of Ohio, Eastern Division.

11.  Prior to filing this action, Plaintiff filed a charge with the Equal Employment Opportunity Commission (hereinafter "EEOC") that alleged discrimination based on her gender and retaliation, and which gave adequate notice to her employers of her hostile work environment based on such discrimination and retaliation.

12.  On May 5, 2026 the EEOC issued to Plaintiff of its final determination in this charge with a right to sue her employer.  This charge contains the same discriminatory and retaliatory acts set forth in this Complaint, including claims that have reasonably grown out of the claims she set forth before the EEOC.  Thus, Plaintiff has exhausted her remedies against her employers under Title VII.

13.  Under Section 4112.052(B)(2)(b)(ii) of the Ohio Revised Code:  (1) Plaintiff has or will file her charge with the Ohio Civil Rights Commission under Section 4112.051 of the Ohio Revised Code that alleged discrimination based on her gender and retaliation that was alleged to start on January 10, 2025 as a continuous course of action; (2) Plaintiff previously filed her charge with the EEOC in or about December 2025 with respect to the discriminatory and retaliatory practice complained of in this Complaint, and (3) Plaintiff received notice from the EEOC on or about May 5, 2026 that she may bring a civil action against her employers.  Thus, Plaintiff has exhausted her remedies against her employers under Section 4112.02.

14.  All claims and conduct Plaintiff asserts herein under Title VII and R.C. Chapter 4112 is conduct that has reasonably grown out of the charges she has submitted to the EEOC and OCRC.

**PARTIES**

15.  Plaintiff Erin Underwood is a female who resides in Richland County, Ohio, and she was an employee as defined by Title VII and R.C. Chapter 4112, entitled to protection under the FCA, an employee entitled to assert her rights under the EPA and R.C. 4111.17, an employee entitled to assert her rights under R.C. 4113.52, and an individual who has been damaged by the criminal acts of Defendants.  From in or about June 2022 Plaintiff was employed by Defendants in Richland County, Ohio.

16.  Five Handicap, Inc. (hereinafter "Five Handicap") is an active Ohio Corporation, and it appears to do business as Mansfield Graphics or Mansfield Graphic, but Five Handicap has not reported the use of Mansfield Graphics or Mansfield Graphic as fictitious names to the Ohio Secretary of State as required by Section 1329.01(D) of the Ohio Revised Code.

17.  Mansfield Graphics and/or Mansfield Graphic (hereinafter "Mansfield Graphics") is believed to be owned and operated by Defendants Charles Bernard McCartney, Carol McCartney, and Jason McCartney (hereinafter together "the McCartney Defendants") as individuals as a sole proprietorship.  Defendant Five Handicap is being named and sued in the event that it is a real party in interest as an employer for purposes of liability in this action even though it and the McCartney Defendants failed to take any action to report the use of Mansfield Graphics as a fictitious name to avoid personal liability upon the McCartney Defendants.

18.  In the event that Five Handicap is a real party in interest, upon information and belief it operates in an undercapitalized fashion, and/or operated without sufficient separation, formalities, independent decision-making, or financial independence, and the McCartney Defendants used their control to commit or facilitate the discriminatory, retaliatory, wage, whistleblower, and criminal acts plead herein.  Five Handicap has been and is operated by the

5

McCartney Defendants in a manner that was so complete that it has/had no separate mind, will, or existence of its own. The McCartney Defendants have exercised and continue to exercise control over Five Handicap in a manner related to the acts complained of in this Complaint, including illegal acts. The control of Five Handicap and the wrong(s) alleged herein, including illegal act(s), resulted in injury or unjust loss to Plaintiff as alleged herein. As a result, the corporate entity of Five Handicap to protect the personal liability of the McCartney Defendants should be disregarded.

19. Defendant Charles Bernard McCartney is an individual and is an owner of Mansfield Graphics, which operates as a sole proprietorship, and/or alternatively under Five Handicap, which corporate entity status should be disregarded. This Defendant is thus defined as an employer under Title VII and R.C. Chapter 4112. Further, this Defendant has individual liability for claims asserted by Plaintiff under R.C. 4112.02(I), R.C. 4112.02(J), the EPA, R.C. 4111.17, R.C. 2307.60, and for a violation of Ohio public policy as alleged herein. This Defendant, is commonly known as Chuck McCartney, and has been referred to as an owner and the chief executive of Mansfield Graphics and/or Five Handicap, and he operated as a decision-maker who exercised authority over employees including Plaintiff's employment. This Defendant had the authority and ability to: hire and fire employees including Plaintiff; control Plaintiff's work schedule and/or conditions of her employment; and/or maintain employment records that included Plaintiff.

20. Defendant Carol McCartney is an individual and is an owner of Mansfield Graphics, which operates as a sole proprietorship, and/or alternatively under Five Handicap, which corporate entity status should be disregarded. This Defendant is thus defined as an employer under Title VII and R.C. Chapter 4112. Further, this Defendant has individual liability for

claims asserted by Plaintiff under R.C. 4112.02(I), R.C. 4112.02(J), the EPA, R.C. 4111.17, R.C. 2307.60, and for a violation of Ohio public policy as alleged herein.  This Defendant has been referred to as an owner of Mansfield Graphics and/or Five Handicap, and she operated as a decision-maker who exercised authority over employees including Plaintiff's employment. This Defendant had the authority and ability to:  hire and fire employees including Plaintiff; control Plaintiff's work schedule and/or conditions of her employment; and/or maintain employment records that included Plaintiff.

21.  Defendant Jason McCartney is an individual and is an owner of Mansfield Graphics, which operates as a sole proprietorship, and/or alternatively under Five Handicap, which corporate entity status should be disregarded.  This Defendant is thus defined as an Employer under Title VII and R.C. Chapter 4112.  Further, this Defendant has individual liability for claims asserted by Plaintiff under R.C. 4112.02(I), R.C. 4112.02(J), the EPA, R.C. 4111.17, R.C. 2307.60, and for a violation of Ohio public policy as alleged herein.  This Defendant has been referred to as owner and the president of Mansfield Graphics and/or Five Handicap, and he operated as a decision-maker who exercised authority over employees including Plaintiff's employment.  This Defendant had the authority and ability to:  hire and fire employees including Plaintiff; control Plaintiff's work schedule and/or conditions of her employment; and/or maintain employment records that included Plaintiff.

## GENERAL ALLEGATIONS

### Introduction/Summary

22.  Plaintiff incorporates by reference each of the preceding paragraphs, as if fully restated herein.

23.  This action arises from a sustained course of sex discrimination, unequal pay,

7

retaliation, whistleblower reprisal, and workplace intimidation directed at Plaintiff during her employment at the Mansfield, Ohio manufacturing operation known as Mansfield Graphics.

24.  Defendant Five Handicap or the McCartney Defendants have operated the same business under the Mansfield Graphics name.  The evidence will show that Plaintiff's employer has been referred to as "Five Handicap, Inc., DBA Mansfield Graphics," the "Five Handicap team," have used the names "Mansfield Graphics" *and* "Mansfield Graphic" interchangeably, and failed to provide Plaintiff with a clear and consistent account of the name or legal entity that employed her.

25.  Plaintiff worked in quality control, served as Lead Quality Control Inspector, performed office and customer-facing functions, but she was later relegated to coloring and cleaning work after she repeatedly challenged and complained of sex-based disparities, quality failures, unsafe conditions, and also practices she reasonably believed could result in false representations to the federal government as a customer of her employer through the DOD, NASA, or otherwise.

26.  Defendants treated production and technical work as "men's jobs," denied women equal access to training and advancement, paid Plaintiff less than newer, male employees who performed equal or substantially similar work, and applied discipline more harshly to Plaintiff and other women and/or employees who challenged or made complaints to the employer's management.

27.  Defendants favored male employees and disparately treated Plaintiff as a female. Specifically, Defendants treated male employees differently by permitting them to sleep at work, violate safety rules, miss work, and commit comparable or more serious errors without negative employment action that would be directed to Plaintiff for the same conduct.

8

28.  Plaintiff Erin Underwood is a female who was employed by Defendants from on or about June 6, 2022, until Defendants failed to return her to work after December 2025 and removed her from their payroll on or about April 30, 2026, and thus effectively terminated or constructively terminated her employment by refusing and/or failing to schedule her for work at Defendants' place of employment.

29.  Plaintiff was never formally terminated by her employer Defendants.

30.  At all times relevant, Defendants as Plaintiff's employer were and/or are a general contractor and/or subcontractor with the federal government in contracts with the DOD, NASA, and other federal agencies and/or departments.  The precise contracts and information concerning such contracts are in possession of Defendants.  Upon information and belief, Defendants manufactured parts for customers within federal defense and aerospace supply chains, including:  TE Connectivity (Mansfield, Ohio; Fairview, North Carolina; and Amermex); Honeywell-Grimes; Ontic Engineering & Manufacturing; Baker Hughes (GE Reuter's); Accutrex; Advanced Thermal Batteries (ATB); and Whitesell Corporation/Whitesell Group, including parts used in electrical assemblies for commercial and military aircraft.

### Plaintiff Performed Quality, Production, & Customer-Facing Work

31.  Defendants hired Plaintiff in approximately June 2022 at an hourly rate of about $15.00.  She learned the business, performed production-related work, worked in quality control, and became Lead Quality Control Inspector.

32.  As a quality-control employee and lead, Plaintiff was responsible for checking parts, measurements, shop orders, routers, inspection documentation, processing status, and whether work was ready to move to another stage or to a customer.

9

33.  Plaintiff also worked in the front office and communicated with customers concerning orders, shipment readiness, heat treatment, plating, inspections, and production timing.  These duties gave her first-hand knowledge of the gap between actual shop-floor conditions and information communicated to customers.

34.  Plaintiff performed her duties in good faith and repeatedly attempted to prevent avoidable quality, safety, and customer problems.  Her contemporaneous communications described mistakes as "out of control and getting worse" and identified at least one plating job as having been shipped approximately eight processing steps too soon.

35.  Defendants acknowledged Plaintiff's usefulness by assigning her quality, lead, office, and customer-facing responsibilities, and by increasing her hourly rate over time.

36.  Defendants later relied on subjective criticisms and selectively documented mistakes only after Plaintiff became persistent in challenging management.

### *Defendants Maintained Gender Based Job Channels With Unequal Opportunity & Disparate Treatment*

37.  Defendants' workplace was male dominated, and they treated technical, machine, maintenance, and leadership positions as work for men while channeling women into coloring, cleaning, clerical, and other lower-status assignments, and assigning women handle-pulling work only when no male employees were available to operate the presses.  Upon information and belief, when Defendants hired a male and a female applicant at or about the same time, the male was assigned to machining or other technical work and the female was assigned to cleaning, and no male employee was assigned cleaning work during Plaintiff's employment except the etch-side lead when rush orders required it.

38.  The pattern instituted by Defendants of a gender based allocation of jobs in their

workplace, denied Plaintiff and other female employees experience, training, responsibility, promotional opportunity, and compensation that were made available to men.

39.  Females employed by Defendants, including Plaintiff, were denied equal access to training, technical training, responsibility, and favorable placements.  Examples include the following:

A.  Kaylee Stephens is a female employee who was qualified to operate multiple CNC machines, but Defendants moved or blocked her from advancement in favor of a less qualified male trade-school student who required monitoring by others, including by Ms. Stephens, to perform the functions of the position.

B.  Storm Radcliff is a female employee who was moved from quality control to handle-pulling, to work management – referred to as "work treated as suitable for women."  Ms. Radcliff further experienced retaliation after associating with Plaintiff and supporting Plaintiff's complaints and concerns related to disparity in the workplace, fraud against the Government, and workplace safety issues.

C.  Plaintiff was advanced to Lead Quality Control Inspector and performed customer-facing office work, but after reporting discrimination, quality failures, federal contract concerns, and safety hazards, Defendants stripped her lead status, returned her to quality control without the lead role, and ultimately relegated her to coloring and cleaning while men received preferred production and technical assignments.

D.  Defendants provided male employees with formal training and advancement opportunities that were denied to female employees. For example, Defendants sent Robert Baker, a male employee, to Washington State for a week of paid, in-depth waterjet training and later promoted him to Production Manager, while qualified female

11

employees such as Ms. Stephens were denied training and advancement and Plaintiff's process-improvement suggestions were disregarded.

40.  Defendants selected men for more favorable, technical opportunities, and they tolerated mistakes by male employees that management used as grounds to discipline or demote their female employees.  Defendants' disparate discipline extended to termination and rehire decisions, where Female employees were terminated outright.  For example:

A.  Lilli Thornton, was terminated for a single shipping-paperwork error that she did not even make, while male employees who committed repeated and more serious errors were retained, reassigned, or rehired.

B.  Grant Best was repeatedly demoted for measurement errors and documentation failures, but he was never terminated and was rehired after an extended unexcused absence.

C. John Brumfield was terminated for serious errors, but he was subsequently rehired by Defendants.

41.  Defendants applied discipline more harshly to women.  Infractions by males employees were observed by Defendants, such as, the failure to wear safety glasses and sleeping on the job and took no disciplinary action against them.  By contrast, female employees were written up or sent home for sleeping or comparable conduct.  Plaintiff was repeatedly sent home, reassigned, or disciplined for the same and/or similar conduct that management excused when committed by male employees or employees who did not question the practices of Plaintiff's employer related to disparity in the workplace, fraud against the Government, and workplace safety issues.

42.  Defendants suspended Plaintiff for approximately one week in connection with a

12

silver production run and alleged hourly-check failures even though the router and work order were inconsistent and lead personnel had not enforced the same checks consistently.

43.  Plaintiff was told by Defendant Charles McCartney that older and superficial mistakes had been added to the write her up so that Defendants could justify discipline upon her in the workplace.

44.  Defendants disparately treated employees who did not raise concerns or complaints of related to disparity in the workplace, fraud against the Government, and workplace safety issues without the same level of discipline they imposed upon Plaintiff for similar work infractions.

45.  The inconsistency used by Defendants and disparity of discipline in the workplace favored their male employees over female employees.

46.  The inconsistency used by Defendants and disparity of discipline in the workplace favored employees who did not raise concerns or complaints of related to disparity in the workplace, fraud against the Government, and workplace safety issues.

47.  Defendants presented and can present no legitimate business reason for the disparity in the discipline in their workplace based on gender or challenges to their employment practices. Any reason advanced by Defendants to explain or justify such disparity have no basis in fact and is or would be pretextual.

48.  The disparity demonstrated in the difference in discipline to Plaintiff based on her gender is in close proximity to her complaints and concerns to Defendants of its workplace environment as alleged herein.

49.  Plaintiff internally raised the concern and complained about the disparity in discipline based on gender in Defendants' workplace to their attention, but Defendants failed to

13

investigate and/or correct such disparity.  Instead, Defendants' increased their retaliation and hostility against Plaintiff for reporting the issue of disparity.

### Defendants Paid Plaintiff Less Than Male & Newer Employees For Equal Or Substantially Similar Work

50.  Plaintiff started working for Defendants at approximately $15.00 per hour, and she received incremental increases of her hourly wage to approximately $15.50, $16.00, $16.50, and later $17.00.  The existence of such increases did not eliminate the disparity in pay to Plaintiff.

51.  By the time Plaintiff had approximately two years of experience, Defendants were hiring new male employees at approximately $17.00 or $18.00 per hour while Plaintiff's pay remained at approximately $16.50 for work that was equal or required greater skill, effort, and responsibility than the newly hired male employees.

52.  Defendants' male employees, including an employee known as Benjamin, who performed quality-control or related work that required substantially the same skill, effort, and responsibility under similar working conditions as the work performed by Plaintiff received more favorable treatment in pay, status, discipline, and opportunities for advancement.

53.  Defendants provided male employees greater raises and preferred placements.  For example:

A.  Grant Best, a male employee was returned after an extended no-call/no-show associated with incarceration, he was placed in a preferred quality-control department, and he was paid approximately $20.00 per hour.  Mr. Best received quality-control work, greater pay than Plaintiff had received while performing lead responsibilities, and substantially more lenient discipline.

B.  Defendants also selected a less qualified male trade-school student for a

technical opportunity over Kaylee Stephens, who was already qualified to operate multiple CNC machines and had to monitor his work.

C. Upon information and belief, Defendants also promoted Andy McIntyre, a male employee whose prior supervisory experience was at a pizza shop, to Vice President of Operations with a raise of approximately $30,000, a Christmas bonus of approximately $2,500, and a company-paid country-club membership, despite his lack of qualifications and repeated misrepresentations to Defendants' customers.

D. Prior to the promotion of Mr. McIntyre, Defendants placed Gordie German, a former assistant golf professional with no manufacturing background, in the same Vice President of Operations position. No female employee was considered for, offered, or given a comparable position, raise, or benefit.

54. Defendants presented and can present no legitimate business reason for the disparity in the payment of wages or in other favorable treatment in their workplace based on gender. Any reason advanced by Defendants to explain or justify such disparity have no basis in fact and is or would be pretextual.

55. The disparity demonstrated in the difference of pay and less favorable treatment to Plaintiff based on her gender is in close proximity to her complaints and concerns to Defendants of its workplace environment as alleged herein.

56. The disparity in wages and treatment in the workplace based on gender in Defendants' workplace was brought to their attention, but Defendants failed to investigate and/or correct such disparity. Instead, Defendants' increased their retaliation and hostility against Plaintiff for reporting the issue of disparity.

*Plaintiff Opposed Sex Discrimination & Unequal Treatment*

57. Plaintiff complained internally to Defendants' management that women were treated differently in assignments, training, pay, discipline, and access to management positions. She objected when women were moved aside for men, when men were paid more for the same work, and when management excused men for conduct used against women.

58. Defendants maintained a practice demeaning women and refusing to acknowledge them in their workplace, which Plaintiff raised as concerns to or in the presence of managers and responsible officials, including, Defendants Charles McCartney, Jason McCartney, and others. For example:

A. Regardless of Plaintiff's complaints, Defendant Charles McCartney and other members of management regularly made sexist and demeaning remarks about and to female employees, including Defendant Charles McCartney's statements, in substance, that no man wants to clean, color, or debur because "that's a woman's job." Said conduct was witnessed and observed by other employees, including senior CNC programmer Mike Spencer.

B. Although Defendants' employee manual solicited suggestions, any new ideas, suggestions made by Plaintiff and other female employees were ignored, while Defendants acted on input from less knowledgeable male employees.

16

59.  Plaintiff reasonably and in good faith believed and complained that the treatment she opposed violated Federal and Ohio discrimination and equal-pay laws.

60.  After Plaintiff made her complaints of discrimination based on her gender, the discrimination and hostility toward her continued and increased.

61.  Defendants understood and knew that Plaintiff was challenging sex-based disparate treatment in their workplace.

62.  Rather than investigate and correct such gender based disparities after Plaintiff's complaints, Defendants characterized Plaintiff as disloyal, difficult, not a team player, and an employee who was looking for problems.  This conduct by Defendants increased the hostility in Plaintiff's work environment based on her gender and in retaliatory response to her complaints.

63.  Defendants failed to take appropriate, prompt, and remedial measures to address the discriminatory disparities in their workplace after Plaintiff's complaints.

64.  In or about December 2025, Plaintiff also submitted her complaints of discrimination, and hostility based on her gender and retaliation to the EEOC.

65.  After her complaints to her employer and to the EEOC of discrimination and retaliation in her workplace by Defendants increased and eventually they failed to schedule Plaintiff for further work.

### *Plaintiff Reported Quality, Safety & Compliance Concerns*

66.  Beginning no later than January 2024, while Plaintiff worked as a quality control inspector, she learned of and documented concerns regarding production integrity, inspection practices, shipping readiness, safety, protective equipment, and customer or government-related certifications.  She learned that parts were moving through Defendants' production or shipping despite incomplete processing, unresolved inspection issues, out-of-tolerance measurements, or

inaccurate customer-facing information.

67.  The identification of errors and non-conformities was part of the quality-control and lead functions Defendants assigned to Plaintiff.

68.  Plaintiff learned that parts Defendants produced including parts produced as a contractor or subcontractor for contracts with the Federal government were outside the permitted specifications, and that parts represented as nearly ready for shipment had not passed through sufficient quality control.  For example:

A.  Plaintiff observed and documented that parts manufactured for TE Connectivity (Part No. 3-1616322-9; Mansfield Graphics Drawing No. 44567-001; Shop Order no. 89937; Purchase Order No. 2726683565) failed to meet a .001 flatness tolerance, that TE Connectivity had expressly rejected Defendants' requested deviation to .002, and that Defendants nevertheless shipped parts that Plaintiff reasonably believed to be nonconforming, some of which TE Connectivity rejected and returned to Defendants as nonconforming.

B.  Plaintiff further observed and reasonably believed that, for parts requiring NADCAP-certified heat treatment – including parts manufactured for Honeywell-Grimes and Ontic for use in electrical assemblies in commercial and military aircraft – Defendants heat-treated production parts in-house without NADCAP certification while sending scrap pieces to a NADCAP-certified vendor in order to obtain certificates, and then supplied those certificates – in some instances certificates from years earlier – to customers together with the in-house-treated production parts.

C.  Under Defendants' contracts with their aerospace customers, Defendants were required to supply certification paperwork, including NADCAP heat-treat certifications,

18

with the parts they manufactured, and those certification requirements flowed from the customers' contracts with the federal government.  Despite such requirements, Defendant Charles McCartney stated, in substance, that Defendants' customers "are not paying for the part, they are paying for the paperwork."

69.  Plaintiff reasonably believed that this could result in a violation or misrepresentation of the contract(s), a danger to the public health safety, and/or a violation of law, rule, or regulation related to the work produced by Defendants and the Federal contracts.  Plaintiff also reasonably believed the deficiencies and failures she report would result in false or misleading representations to customers concerning manufacturing origin, heat treatment, certification, conformance, completion, and shipment readiness.

70.  Plaintiff also reasonably believed that her employer committed acts to intentionally deceive the federal government as a contractor and/or subcontractor regarding specifications of parts it produced – which she reasonably believed to be a crime as fraud against the federal government, which was conduct her employer had the ability to correct and/or was conduct that was done by a fellow employee.  She also reasonably believed that this conduct was likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, or be a felony.

71.  Plaintiff further reasonably believed that this conduct by Defendants was or would result in a gross mismanagement of federal contracts of her employer and of its customers with the federal government, an abuse of authority relating to a federal contract or grant, specific danger to the public health safety, and/or a violation of law, rule, or regulation related to her employer's federal contract or grants – including its competition for such or future contracts or grants (hereinafter "Fraud against the Government").

19

72. Defendants' conduct caused Plaintiff to reasonably believe that, in furtherance of such Fraud against the Government, as a contractor or subcontractor with the Federal government they had knowingly presented or caused to present false or fraudulent claims for payment or approval of payment and/or knowingly made used, or causes to be made or used, a false record or statement material to a false or fraudulent claim for payment or approval of payment.

73. Beginning in or about January 2024 and continuing through her removal from the workplace, Plaintiff repeatedly reported production, quality, certification, customer-accuracy, and government-contract concerns orally to responsible officers and managers, including Charles McCartney, CJ McCartney, Kaitlyn Payne, Andy McIntyre, Mike Spencer, Robert Baker, and Cory Brandt.

74. Plaintiff also made written reports through Defendants' yellow-pad reporting process (hereinafter "Yellow Pad"), text, and group messages to Charles McCartney and Jason McCartney, through quality-control records, and communications that arose from her assigned customer-facing duties.  She also communicated with Honeywell-Grimes personnel concerning production and compliance status after she was assigned to the front office.

75. The individuals who received Plaintiff's internal reports were owners, managers, supervisors, and responsible officials who had the authority to investigate, discover, or elevate the reported misconduct.

76. Within twenty-four hours after Plaintiff's oral or written report of Fraud against the Government or other violation of law, Plaintiff's employer did not correct the violation or make a reasonable and good faith effort to correct the violation.

77. Plaintiff's report of Fraud against the Government constituted protected activity

20

under the FCA and/or R.C. 4113.52, and once exhausted under Section 4701.

78.  Plaintiff's report of Fraud against the Government constituted a lawful action by her to stop false claims to the Federal government.  Plaintiff's concerns were directed toward stopping or correcting what she reasonably believed were or could become false claims, false certifications, or false statements material to payment under federal contracts or subcontracts.

79.  In her positions as Quality Control Inspector, Lead Quality Control Inspector, and later as an employee assigned to coloring and cleaning, Plaintiff worked with alcohol, caustic substances, acids, cleaning solutions (hereinafter "hazardous substances") and in a facility that she reasonably believed lacked adequate ventilation and controls.  Her employment with Defendants also required her to work with dangerous machinery and electrical hazards.

80.  Beginning in or about July 2025 through on or about December 10, 2025 Plaintiff repeatedly requested orally and in writing that her direct supervisor, Andy McIntyre, and owner Defendant Charles McCartney provide long protective gloves or sleeves sufficient to protect her hands and forearms while cleaning parts with hazardous substances.  She placed repeated requests for such protective materials on Defendants' Yellow Pad, which was reviewed by her supervisor, Mr. McIntyre.

81.  Defendants failed to provide sufficient protective material to Plaintiff, and as a direct result she sustained repeated chemical irritation or burns to her hands and forearms.

82.  Despite that Plaintiff reported the need for protective material, and that Defendants' handbook/employment materials represented that appropriate personal protective equipment would be provided, Defendant Charles McCartney told Plaintiff to purchase the needed protection herself and then resort to seek reimbursement for her expenditures.

83.  During 2025 and continuing through on or about December 20, 2025, Plaintiff and

21

other employees also identified leaking water near an electrical box, that machine protective shields were removed or that inadequate lockout/tagout procedures were in place to protect employees who changed machine parts or worked near machines were missing, the presence of unprotected electrical components, as well as gas and/or other ventilation concerns, inadequate PPF, and the lack of reliable hot water needed for chemical cleaning and etching (together along with the hazardous substances herein after "Workplace Safety Hazards").

84.  Plaintiff orally notified managers, supervisors, owners, and responsible officials, including, Charles McCartney, CJ McCartney, Kaitlyn Payne, Andy McIntyre, Mike Spencer, Robert Baker, and Cory Brandt, among others, and submitted notifications on Defendants' Yellow Pad and messages that contained sufficient detail to identify and describe the Workplace Safety Hazards.

85.  The managers, supervisor, owners, and responsible officials Plaintiff notified had authority to correct these Workplace Safety Hazards, but they did not timely correct them or provide Plaintiff a written explanation of a reasonable and good-faith corrective effort to make such corrections.

### *Retaliation Against Plaintiff by Change in Job Assignments, Increased Discipline & Being Labeled a Saboteur*

86.  Before Plaintiff became persistent in reporting concerns, she progressed from quality-control work to Lead Quality Control Inspector.  After her complaints of discrimination and disparity based on her gender, Fraud against the Government, and Workplace Safety Hazards, Defendants removed her from lead status, moved her to the front office, returned her to quality control without the lead role, and then relegated her to coloring and cleaning.

87.  Defendants' act to change Plaintiff's job assignments were to less desirable positions

22

in Plaintiff's workplace because such positions provided less in pay, status, and opportunities for advancement.

88.  After Plaintiff's complaints of discrimination, disparity, and hostility based on her gender, Fraud against the Government, and Workplace Safety Hazards, Plaintiff faced increased discipline in the workplace.

89.  Specifically, Plaintiff was subject to discipline in the form of being sent home outside of Defendants' progressive discipline based on uncorroborated and false reports of Plaintiff, and on the following workday, production supervisor Robert Baker told Plaintiff that Defendant Charles McCartney directed him to place her in the coloring room, which was a less desirable position without any reason provided for the change in work assignment.

90.  Defendant Charles McCartney told Plaintiff she was not a team player and that she caused issues by trying to find things that were wrong, even though identifying errors and nonconformities was part of the quality function she had been assigned to perform.

91.  As part of her assigned front-office and customer-facing duties, Plaintiff was responsible for communicating with customers about order and production status, shipment readiness, heat treatment, plating, inspections, delays, and expected turnaround times. Defendants Charles McCartney and Jason McCartney and her direct supervisor accused her of sabotaging the company because she truthfully communicated actual production status to customers rather than repeat inaccurate shipment assurances.  Following the accusation of sabotage, Defendant Charles McCartney prohibited Plaintiff from communicating with Defendants' customers, told Plaintiff in substance that customers only "want to hear a date" whether realistic or not, and directed Plaintiff to tell customers what they wanted to hear. Plaintiff refused to mislead Defendants' customers.

92.  Defendants began to further isolate Plaintiff and provide her with unfavorable work assignments and increased unwarranted discipline, which increased the hostility and intimidation in Plaintiff's work environment through public and personal attacks upon Plaintiff that verbally called her out for unwarranted criticism.

93.  The unfavorable work assignments and increased unwarranted discipline constituted adverse employment actions by Defendants toward Plaintiff.

94.  Such adverse employment actions would dissuade a reasonable employee from complaining about sex discrimination, disparity, and hostility, Fraud against the Government, and Workplace Safety Hazards.

95.  Defendants were fully aware of the reprisal/retaliation Plaintiff received and hostility in her workplace directed toward her for her protected activity of complaints of discrimination and disparity in the workplace, Fraud against the Government and Workplace Safety Hazards, but they failed to take any action to stop the reprisal/retaliation and hostility or offer any remedial measures to her.

96.  Defendants permitted the reprisals, retaliation, and hostility to continue against Plaintiff, and their conduct in permitting this continuation of such conduct was done in an effort to humiliate and force Plaintiff to leave her job.

97.  On or about December 9, 2025, Plaintiff attempted to document a facility and safety problem involving the lack of hot water used in or near chemical cleaning and processing functions, and due to conduct by Defendant Charles McCartney in response to this documentation Plaintiff was sent home from work.

98.  On December 10, 2025, immediately after her removal from the workplace, Plaintiff contacted OSHA concerning the Workplace Safety Hazards she had previously reported

24

internally and that she had been sent home from work while attempting to internally report another health and safety issue in Defendants' workplace.

99.  On December 12, 2025, OSHA opened Complaint No. 2379134 (hereinafter "OSHA Complaint") and advised Plaintiff that it had contacted her employer and requested corrective action.  The OSHA Complaint identified alleged chemical-burn hazards from inadequate hand and forearm PPE, electrical-shock hazards from water leaking onto an electrical box, caught-in hazards from removed mill panels or shields, and amputation hazards from changing machine bits without unplugging equipment.

100.  OSHA required Defendants to investigate, correct the conditions, and provide supporting documentation by December 19, 2025.

### The Criminal Knife Assault & Plaintiff's Removal from Work

101.  On or about December 9, 2025, Plaintiff attempted to document a facility and safety problem involving the lack of hot water used in or near chemical cleaning and processing functions.

102.  As Plaintiff used Defendant's Yellow Pad for the documentation of this facility and safety issue, Defendant Charles McCartney approached Plaintiff in an agitated state.

103.  As Plaintiff wrote to document the safety issue, Defendant Charles McCartney forcefully drove a knife through the pad immediately adjacent to Plaintiff's hand.  Plaintiff had to move her hand to avoid injury.  Defendant Charles McCartney then waved the knife near Plaintiff's face while forcibly raising his voice at her.  Upon information and belief, the knife incident was captured by at least two of Defendants' workplace security cameras aimed directly at the location where it occurred.

104.  Plaintiff reasonably understood the conduct as an imminent threat to her safety and

25

was conduct by Defendant Charles McCartney that was intended to frighten, punish, and silence her.

105.  Defendant Charles McCartney, is an owner and decision maker of Plaintiff's employer, and his conduct with the knife and threat toward Plaintiff occurred after months of hostility arising from Plaintiff's complaints of discrimination, disparity, and hostility based on gender, Fraud against the Government, and Workplace Safety Hazards, and while she was again documenting another workplace safety problem.

106.  Plaintiff objected to Defendant Charles McCartney's conduct, reported it to law enforcement, and participated as the victim and witness in the resulting investigation and prosecution against Charles McCartney.

107.  Defendants sent Plaintiff home with pay on December 9, 2025.  When she returned to work the next day, Defendants again required her to leave because of the prior incident the day before with Defendant McCartney and told her to wait for a text or further instruction.

108.  Defendant Charles McCartney was in fact prosecuted for this conduct in the Mansfield Municipal Court, Case No. 2025 CRB 03156 (hereinafter "Criminal Aggravated Menacing Case").

109.  As a part of said prosecution and Defendant Charles McCartney's bond, the Court in the Criminal Menacing Case put in place a no contact Order between him and Plaintiff (hereinafter "No Contact Order").  This No Contact Order was put in place for Plaintiff's safety due to Defendant Charles McCartney's conduct, and it required that he stay away from Plaintiff through the pendency of the prosecution of the Criminal Aggravated Menacing Case.

110.  The No Contact Order resulted in Plaintiff being away from her employment with Defendants with pay until the end of the Criminal Aggravated Menacing Case, which ended on

April 30, 2026.

111.   During the pendency of the Criminal Aggravated Menacing Case and the No Contact Order, Defendants continued to carry Plaintiff on their payroll.  In a July 27, 2026 filing with the Ohio Department of Job and family Services, Defendants admitted that Plaintiff "remained on the payroll through the advice of legal counsel."

112.   The Aggravated Menacing Case concluded on or about April 30, 2026, after which Plaintiff could return to work as the No Contact Order was no longer in effect.  Nevertheless, Defendants never directed Plaintiff to report, never assigned or scheduled her for work, and never restored her to active employment.  Instead, on or about April 30, 2026, Defendants removed Plaintiff from their payroll without informing her that she had been terminated – admitting in the same July 27, 2026 filing that Plaintiff "was determined a 'quit' and removed from the payroll."  Defendants had previously instructed Plaintiff to remain away from the workplace and await further instruction, which corresponds to the No Contact Order in the Criminal Aggravated Menacing Case.  Plaintiff never resigned or voluntarily abandoned her employment with Defendants.

113.   Directly after Plaintiff participated in the prosecution against Defendant Charles McCartney in the Criminal Aggravated Menacing Case, Defendants excluded Plaintiff from employment, ceased providing regular work and wages, and treated her as if she were no longer employed.  These actions constituted a discharge, de facto discharge, and/or constructive discharge, and/or materially adverse discipline.

114.   The conduct of Defendants in excluding Plaintiff from employment constitutes retaliation or attempt to retaliate against her as a victim of a crime, which is conduct in violation of R.C. 2921.05, a felony of the third degree.

27

115.  Defendants' conduct of excluding Plaintiff from employment constitutes a constructive discharge of Plaintiff.

116.  Defendants' conduct of excluding Plaintiff from employment was further done in retaliation for her protected activity in complaining about discrimination, hostility, and disparity in Defendants' workplace.

117.  Defendants' conduct of excluding Plaintiff from employment was further done in retaliation for her protected activity in complaining about Fraud to the Government in Defendants' workplace.

118.  Defendants' conduct of excluding Plaintiff from employment was further done in retaliation for her protected activity in complaining about Workplace Safety Hazards in Defendants' workplace.

119.  Defendants' conduct of excluding Plaintiff from employment was further done in retaliation of her protected activity in her report of violations of law by her employer or fellow employee(s) in Defendants' workplace.

## COUNT ONE

***Discrimination Through Disparate Treatment and a Hostile Work
Environment Based on Gender Against All Defendants as Plaintiff's Employer
in Violation of Title VII & R.C. 4112.02(A) & Against the McCartney
Defendants for Liability Under R.C. 4112.02(J)***

120.  Plaintiff incorporates by reference each of the preceding paragraphs, as if fully restated herein.

121.  Plaintiff is female and thus she was a member of a protected class in terms of her employment with Defendants.

122.  As employers, Defendants owed a duty to Plaintiff to provide a work environment

that was safe and free from discrimination and hostility based on her gender.

123.  The conduct as described herein was severe and pervasive, and it created an environment for Plaintiff that was discriminatory, disparate, hostile, and difficult due to her gender as a female.  The conduct as described herein affected a term, condition, or privilege of Plaintiff's employment with Defendants by the creation of an abusive work environment that affected her ability to do her job, and which would cause any reasonable employee to leave their employment under such conditions.

124.  Defendants knew or, with the exercise of reasonable diligence, should have known of the existence of discrimination and hostility in the workplace for Plaintiff based on her gender.

125.  Defendants specifically knew of the discrimination based on the pattern of disparity based on gender it instituted in its workplace as alleged herein.

126.  Defendants also specifically knew of the discrimination its workplace based on gender due to Plaintiff's complaints about such disparity and hostility as described herein internally to her employer, and due to her complaints to the EEOC.

127.  Despite the fact that Defendants knew or should have known of this discrimination, disparate treatment, and hostility toward Plaintiff, it failed to take appropriate, prompt, and remedial measures in light of her complaints and/or their knowledge.  Any claimed actions taken by Defendants was inadequate, ineffective, and amounted to the failure to act.

128.  Defendants breached their foregoing duty when they failed to take prompt or adequate remedial action in response to Plaintiff's discriminatory and/or hostile work environment.

129.  The action and/or inaction as alleged herein constitutes discrimination against

Plaintiff based on her gender in violation of Title VII and R.C. 4112.02(A) with respect to the tenure, terms, conditions, and/or privileges of her employment.

130.  In terms of discrimination under R.C. 4112.02(J), the McCartney Defendants are liable to Plaintiff for their conduct to:  (A) to aid, abet, incite, compel or coerce discrimination against Plaintiff based on her gender in violation of R.C. 4112.02(A), (B) to obstruct or prevent any person from complying with Chapter 4112 of the Ohio Revised Code, and/or (C) or to attempt directly or indirectly to commit any act declared by R.C. 4112.02 to be an unlawful discriminatory practice.

131.  The conduct of Defendants as described herein was willful, wanton, malicious, and/or knowing, and/or reckless with a complete disregard for the rights of Plaintiff.

132.  As a direct and proximate result of Defendants' unlawful discriminatory misconduct, as described herein, Plaintiff suffered physical and/or emotional distress, pain, upset, humiliation, and economic loss, including lost salary, wages, and benefits, and she has been otherwise injured in an amount greater that $25,000 – the full extent of which will be more fully revealed at the trial of this matter.  Some or all of Plaintiff's damages will continue to accrue indefinitely into the future.

133.  As a further direct and proximate result of the conduct as described herein, Plaintiff was effectively terminated from her employment constructively or otherwise by the failure and refusal of Defendants to schedule her to work.

134.  Alternatively, as a further direct and proximate result of the conduct as described herein, Plaintiff was constructively discharged because such conduct affected a term, condition, or privilege of Plaintiff's employment by the creation of an abusive work environment that affected her ability to do her job, and which would cause any reasonable employee to leave their

employment under such conditions.

## COUNT TWO

### *Retaliation and Hostile Environment based on Retaliation and Disparate Treatment Against the All Defendants as Plaintiff's Employer in Violation of Title VII & R.C. 4112.02(I) & Against The McCartney Defendants for Liability under R.C. 4112.02(J)*

135.   Plaintiff incorporates by reference each of the preceding paragraphs, as if fully restated herein.

136.   Plaintiff engaged in protected activity when she internally complained to her Employer and specifically to Defendants Charles McCartney, Jason McCartney, and CJ McCartney, Kaitlyn Payne, Andy McIntyre, Mike Spencer, Robert Baker, Cory Brandt, and other responsible officials, and to the EEOC about discrimination, disparity, and hostility in her workplace based on her gender.

137.   After Plaintiff engaged in protected activity, she was subjected to retaliation and hostility and/or further retaliation and hostility as alleged herein by the conduct of Defendants in her workplace in violation of Title VII and R.C. 4112.02(I).

138.   Defendants further created a hostile and retaliatory work environment against Plaintiff by permitting such hostile retaliatory work environment to continue in her work environment, which would cause any reasonable employee to leave their employment under such conditions.  The retaliation and hostile retaliation Plaintiff endured in the workplace would dissuade a reasonable employee from engaging in the aforementioned protected activity.

139.   Under R.C. 4112.02(J) the McCartney Defendants are liable to Plaintiff for their conduct to:  (A) to aid, abet, incite, compel or coerce retaliation under R.C. 4112.02(I), (B) to obstruct or prevent any person from complying with Chapter 4112 of the Ohio Revised Code,

31

and/or (C) or to attempt directly or indirectly to commit any act declared by R.C. Chapter 4112 to be an unlawful retaliatory practice.

140. The conduct of Defendants as described herein was willful, wanton, malicious, and/or knowing, and/or reckless with a complete disregard for the rights of Plaintiff.

141. As a direct and proximate result of Defendant's unlawful retaliatory misconduct, as described herein, Plaintiff suffered physical and/or emotional distress, pain, upset, humiliation, and economic loss, including lost salary, wages, and benefits in an amount greater than $25,000, and she has been otherwise injured – the full extent of which will be more fully revealed at the trial of this matter.

142. As a further direct and proximate result of the conduct as described herein, Plaintiff was effectively terminated from her employment constructively or otherwise by the failure and refusal of Defendants to schedule her to work. Said conduct by Defendants was also done in further retaliation to Plaintiff for her complaints of discrimination and retaliation as alleged herein.

143. Alternatively, as a further direct and proximate result of the conduct as described herein, Plaintiff was constructively discharged because such conduct of Defendants affected a term, condition, or privilege of Plaintiff's employment by the creation of an abusive work environment that affected her ability to do her job, and which would cause any reasonable employee to leave their employment under such conditions.

### COUNT THREE

*Relief From Retaliation in Violation of 31 U.S.C. §3730(h) for the Making False Claims to the Federal Government Against Defendants as Plaintiff's Employer*

144. Plaintiff incorporates by reference each of the preceding paragraphs, as if fully

restated herein.

145. The FCA bars Defendants as Plaintiff's employer from making false claims, records, statements, or certifications to the Federal government for the receipt of federal payment.

146. The FCA further bars Defendants from retaliating against any employee who engages in protected activity by taking lawful actions in furtherance of an FCA claim or by taking efforts and activity to stop or prevent violations of the FCA.

147. As alleged herein, Defendants engaged in conduct that included false claims, records, statements, or certifications to the Federal government as contractors or subcontractors with the DOD, NASA, or otherwise by conduct that caused Plaintiff to reasonably believe that as a contractor or subcontractor with the Federal government they had knowingly presented false or fraudulent claims for payment and/or knowingly made or used a false record or statement material to a false or fraudulent claim for payment.

148. As alleged herein, Plaintiff engaged in protected activity under the FCA from her disclosures to Defendants to stop and prevent such FCA violations.

149. Defendants retaliated against Plaintiff in violation of 31 U.S.C. §3730(h) when it subjected her to hostility in her workplace and negative employment action as alleged herein, and by failing to return her to work.

150. Any reasons advanced or that will be advanced by Defendants for any negative employment action against Plaintiff and/or for failing to return to her to or schedule her for work is pretextual for her protected activity and had no basis in fact.

151. Defendants' conduct as alleged herein was in violation of the FCA under 31 U.S.C. §3730(h).

152. Defendants violations of the FCA were done willfully, knowingly, and/or to the reckless to disregard of the rights of Plaintiff.

153. As a direct and proximate result of Defendants' violation of the FCA, Plaintiff suffered upset, humiliation, and she incurred future economic loss, including lost salary, wages, and benefits, and she has been otherwise injured – the extent of which will be more fully revealed at the trial of this matter. Some or all of Plaintiff's damages will continue to accrue indefinitely into the future.

154. As a result of Defendants' FCA violations under Section 3730(h)(2), Plaintiff is entitled to reinstatement with the same seniority status that she had but for the retaliation, two times the amount of back pay, interest on the back pay, and compensation for any special damages sustained as a result of the conduct, including litigation costs and reasonable attorneys' fees.

## COUNT FOUR

### *Retaliation Against All Defendants as Plaintiff's Employer in Violation of R.C. 4113.52*

155. Plaintiff incorporates by reference each of the preceding paragraphs, as if fully restated herein.

156. In the course of her employment with Defendants, Plaintiff became aware of conduct that her employer committed acts to intentionally deceive the Federal government as a contractor or subcontractor with the DOD, NASA, or otherwise regarding specifications of parts and/or as conduct alleged as Fraud against the Government herein.

157. Plaintiff reasonably believed such conduct by Defendants as her employer to be a crime as fraud against the federal government.

34

158.   Defendants as Plaintiff's employer had the ability to correct the conduct she reasonably believed constituted Fraud against the Government.

159.   The conduct Plaintiff reasonably believed constituted Fraud against the Government was conduct done by a fellow employee.

160.   Plaintiff reasonably believed that said conduct was likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, or constitute a felony.

161.   Plaintiff orally notified a supervisor or other responsible officer of her employer of the Fraud against the Government, and she subsequently reported in writing to this person with sufficient detail that described the Fraud against the Government.

162.   After Plaintiff reported the conduct described as Fraud against the Government, Defendants as Plaintiff's employer, within twenty-four hours or otherwise, failed to correct the conduct or they failed to make a reasonable and good faith effort to correct the conduct.

163.   After Plaintiff engaged in such notifications, Defendants took retaliatory action against her, with the last date of said retaliatory action being on or about April 30, 2026 when Defendants could have returned her to work after the prosecution of Defendant Charles McCartney was completed and the No Contact Order ended but failed to schedule or return her to work.  April 30, 2026 is the same date that Defendants removed Plaintiff from their payroll.

164.   Said retaliation by Defendants constitutes a violation of R.C. 4113.52

165.   The conduct of Defendants as described herein was a deliberate, willful, wanton, malicious, and/or knowing, and/or reckless with a complete disregard for the rights of Plaintiff.

166.   As a direct and proximate result of Defendant's unlawful retaliatory misconduct, as described herein, Plaintiff suffered the loss of her job, physical and/or emotional distress, pain, upset, humiliation, and economic loss, including lost salary, wages, and benefits in an amount

35

greater than $25,000, and she has been otherwise injured – the full extent of which will be more fully revealed at the trial of this matter.

167.  Further, under R.C. 4113.52(E), Plaintiff is entitled to reinstatement to the same position she held at the time of the retaliatory action, the payment of back wages, full reinstatement of fringe benefits and seniority rights, the costs of litigation, and reasonable attorney's fees, witness fees, and fees for experts who testify at trial, in an amount the court determines appropriate.

## COUNT FIVE

### *Discrimination in Pay Based on Gender Against All Defendants in Violation of the EPA and R.C. 4111.17*

168.  Plaintiff incorporates by reference each of the preceding paragraphs, as if fully restated herein.

169.  The EPA (29 U.S.C. §206(d)) and R.C. 4111.17 prohibit discrimination on the basis of pay against based on an employee's gender.

170.  Defendants' practice of paying Plaintiff as a female a disparately lower wage compared to male employees violated the EPA and R.C. 4111.17.

171.  By engaging in this conduct in failing to pay Plaintiff an equal wage based on her gender Defendants have directly and/or have willfully, knowingly, and/or recklessly violated the EPA and R.C. 4111.17.

172.  Because of Defendants' violation of the EPA, they are liable to Plaintiff for damages under 29 U.S.C. §216(b) for her unpaid wage differential, and liquidated damages equal to this amount, and for equitable relief in the form of employment, reinstatement, and promotion.

173. In addition because of Defendants' violation of the EPA, they are liable to Plaintiff for reasonable attorney fees, and other costs to Plaintiff to maintain her action against Defendants.

## COUNT SIX

### *Civil Liability for a Criminal Act (Retaliation Against Plaintiff as a Victim of a Crime) Under R.C. 2307.60 With Respect to R.C. 2921.05 Against the McCartney Defendants*

174. Plaintiff incorporates by reference each of the preceding paragraphs, as if fully restated herein.

175. Under R.C. 2921.05(B), no person purposefully by unlawful threat of harm to any person or property shall retaliate against a victim of a crime because the victim filed or prosecuted criminal charges. R.C. 2921.05(C) carries with it a criminal penalty of a felony of the third degree.

176. Under R.C. 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

177. Plaintiff was a victim of the crime of Aggravated Menacing by Defendant Charles B. McCartney a criminal defendant in the Criminal Aggravated Menacing Case that she filed/reported and assisted in the prosecution against him.

178. During the pendency of the Criminal Aggravated Menacing Case, at Defendants' direction Plaintiff was on paid leave from her employment. There was also a No Contact Order in the Criminal Aggravated Menacing Case that required her separation from Defendant Charles B. McCartney. Plaintiff remained on Defendants' payroll and remained employed by Defendants during the pendency of the Criminal Aggravated Menacing Case.

179. On or about April 30, 2026 the Criminal Aggravated Menacing Case against

37

Defendant Charles B. McCartney ended, the No Contact was lifted, and Plaintiff was then able to physically return to work for Defendants.

180. Since on or about April 30, 2026 and the end of the Criminal Aggravated Menacing Case, Defendants ceased in their payment to Plaintiff, and since the end of the Criminal Aggravated Menacing Case Defendants have failed and refused to schedule or otherwise return Plaintiff to work.

181. The McCartney Defendants as Plaintiff's employer have purposefully harmed Plaintiff by depriving her of employment as retaliation against her for her role as a victim of the Criminal Aggravated Menacing Case filed and prosecuted against Defendant Charles B. McCartney.

182. Alternatively, the McCartney Defendants as Plaintiff's employer engaged in conduct that if successful would have deprived Plaintiff of her employment as retaliation against her for her role as a victim of the Criminal Aggravated Menacing Case filed and prosecuted against Defendant Charles B. McCartney.

183. As direct and proximate cause of this unlawful conduct by Defendants, Plaintiff has had a term, condition, or privilege of her employment at with Defendants affected and she has been retaliated against by the harm of the loss of her employment.

184. As a direct and proximate cause of this unlawful conduct by Defendants, Plaintiff had been discharged and/or constructively discharged from her employment.

185. As a direct and proximate cause of this unlawful conduct by Defendants, Plaintiff has and will continue to suffer economic and non-economic damages in an amount greater than $25,000 for which these Defendants are liable including, but not limited to, pain and suffering, the loss of salary, wages, and benefits and other terms, privileges, and condition of her

employment.

186.   The acts of Defendants were willful, egregious, malicious, and worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.  Alternatively, Defendants knowingly committed the acts alleged herein.

187.   Because of the harm sustained by Plaintiff based on conduct of the McCartney Defendants that constitute criminal acts under R.C. 2921.05(B) or R.C. 2923.02(A), she is able to bring a civil claim for damages against them under R.C. 2307.60.

## COUNT SEVEN

### *Retaliation in Violation of Ohio Public Policy Against Defendants as Plaintiff's Employer for Her Reports of Work Safety Hazards*

188.   Plaintiff incorporates by reference each of the preceding paragraphs, as if fully restated herein.

189.   Plaintiff had a good faith belief that Defendants failed to provide a safe work environment required by and reflected in R.C. 4101.11, R.C. 4101.12, and Art. II, Section 34 of the Ohio Constitution, which authorize and require the protection of employee health and safety.

190.   The public policy in Ohio is further rooted in its common law as described in *Kulch v. Structural Fibers, Inc.*, 78 Ohio St. 3d 134, 152 (1997), in which the Supreme Court of Ohio stated that "[t]he public policy of this state demands that employees be provided with a safe work environment and that unsafe working conditions be corrected."

191.   29 U.S.C. §660(c) of OSHA prohibits retaliation against employees who report safety concerns to OSHA.  Ohio's clear public policy likewise prohibits retaliation, discipline, or the discharge of employees who make good faith complaints about workplace safety as set forth by the Supreme Court of Ohio which set forth in *Pytlinski v. Brocar Prod., Inc.*, 94 Ohio St. 3d

39

77, 79-80 (2002) that:

> In Kulch, we recognized the abundance of Ohio statutory and constitutional provisions that support workplace safety and form the basis for Ohio's public policy, which is "clearly in keeping with the laudable objectives of the federal Occupational Safety and Health Act." . . . We concluded that retaliation against employees who file complaints regarding workplace safety clearly contravenes the public policy of Ohio.

192.  Through her employment with Defendants Plaintiff consistently reported her concerns of Workplace Safety Hazards in Defendants' internally to her employer through Charles McCartney, CJ McCartney, Kaitlyn Payne, Andy McIntyre, Mike Spencer, Robert Baker, Cory Brandt, and other responsible officials; and repeated written entries on Defendants' Yellow Pad, and through text or group messages to Defendant Charles McCartney and CJ McCartney.

193.  Plaintiff had a good faith belief in the legitimacy of her concerns of health and safety issues in Defendants' workplace when she made her reports of Workplace Safety Hazards internally to her employer.

194.  As Plaintiff made and repeated her reports of concerns internally to her employer of Workplace Safety Hazards, Plaintiff was subjected to hostility, discipline and negative employment action.  Defendants criticized her as not being a team player and as causing problems by finding things wrong, stripped her lead responsibilities, moved her among quality control, the front office, and back to quality control without the lead role, relegated her to coloring and cleaning, isolated her, subjected her to selective discipline, sent her home, and ultimately failed to restore her to work.

195.  On or about December 10, 2025, Plaintiff reported her concerns of Workplace Safety Hazards in Defendants' workplace internally and to OSHA.  On December 12, 2025,

40

OSHA notified Defendants of Complaint No. 2379134 and requested investigation and corrective action.

196. Plaintiff had a good faith belief in the legitimacy of her concerns of health and safety in Defendants' workplace when she made her reports of Workplace Safety Hazards to OSHA.

197. After OSHA notified Defendants of Plaintiff's complaint, and consistent with the adverse treatment that had followed her internal reports, Defendants kept Plaintiff away from the workplace, failed to restore her to work when the Criminal Aggravated Menacing Case and No Contact Order ended, removed her from payroll, and terminated or constructively terminated her employment.

198. The negative employment action taken by Defendants toward Plaintiff was motivated by her reports internally and to OSHA of the Workplace Safety Hazards. Defendants lacked an overriding legitimate business justification for taking adverse actions against Plaintiff.

199. Retaliating against Plaintiff through reassignment, discipline, removal from work, cessation of pay, and termination or constructive termination jeopardized Ohio's clear public policy favoring workplace safety by deterring employees from reporting similar hazards.

200. As a direct and proximate result of Defendants' conduct, as described herein, Plaintiff suffered the loss of her job, physical and/or emotional distress, pain, upset, humiliation, and economic loss, including lost salary, wages, and benefits in an amount greater than $25,000, and she has been otherwise injured – the full extent of which will be more fully revealed at the trial of this matter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Erin Underwood respectfully requests that this Court enter

41

judgment in her favor and against Defendants, jointly and severally, and award the following relief:

A.  Compensatory damages in an amount in excess of $25,000, including back pay, front pay, lost wages, salary, benefits, and other economic loss, in an amount to be determined at trial;

B.  Damages for emotional distress, pain, upset, humiliation, and loss of enjoyment of life;

C.  Under 31 U.S.C. § 3730(h)(2), reinstatement with the seniority status Plaintiff would have had but for the retaliation, two times the amount of back pay, interest on the back pay, and compensation for special damages, including litigation costs and reasonable attorneys' fees;

D.  Under R.C. 4113.52(E), reinstatement to her former position, back wages, full reinstatement of fringe benefits and seniority rights, costs of litigation, and reasonable attorney's, witness, and expert fees;

E.  Under 29 U.S.C. § 216(b) and R.C. 4111.17, the unpaid wage differential, an equal amount as liquidated damages, and equitable relief including employment, reinstatement, or promotion;

F.  Punitive damages for conduct that was willful, wanton, malicious, and/or in reckless disregard of Plaintiff's rights, including under R.C. 2307.60;

G.  Pre-judgment and post-judgment interest;

H.  Reasonable attorneys' fees and costs under 42 U.S.C. § 2000e-5(k), R.C. 4112.99, 31 U.S.C.§ 3730(h), R.C. 4113.52(E), and 29 U.S.C. § 216(b); and

I.  Such other legal and equitable relief as this Court deems just and proper.

Respectfully submitted,

s/ David Glenn Phillips
DAVID GLENN PHILLIPS (0046827)
The Brown Hoist Building
4403 St. Clair Avenue
Cleveland, Ohio 44103
(216) 531-0123
Email: d.g.phillips@davidglennphillips.com
         civilrightslaw@davidglennphillips.com


/s/ Richard J. Tappan
Richard J. Tappan*
Tappan Law
1629 K St. NW, Ste. 300
Washington, DC 20006
Tel: (571) 276-9681
rich@tappanlaw.com
*Admitted in DC and NY; motion for admission
pro hac vice forthcoming

*Attorneys for Plaintiff*


## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable, with the maximum number of jurors permitted by law.


/s/ David Glenn Phillips
DAVID GLENN PHILLIPS

43